# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TIFFANY D. ATKINS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:15-cv-1385-MHH** |
| | } | |
| **DR. MARK T. ESPER, Secretary of** | } | |
| **the Army,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This employment discrimination case is before the Court on the defendant's

motion for summary judgment. (Doc. 27). Plaintiff Tiffany Atkins contends that

the defendant, the United States Army, discriminated against her because she is

African-American and female and retaliated against her after she reported acts of

discrimination. Ms. Atkins asserts Title VII claims against Dr. Mark T. Esper in

his official capacity as Secretary of the Army.[1] Pursuant to Rule 56 of the Federal

Rules of Civil Procedure, the Army asks the Court to enter judgment in its favor on

---

[1] *See* FED. R. CIV. P. 25(d) ("[W]hen a public officer who is a party . . . ceases to hold office while the action is pending[, t]he officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name . . . . The court may order substitution at any time, but the absence of such an order does not affect the substitution."); (*see also* Doc. 1 (naming then-Secretary John McHugh as defendant); Doc. 18 (naming then-Secretary Eric Fanning as defendant); Doc. 44 (naming then-Acting Secretary Ryan D. McCarthy as defendant)). The Court takes judicial notice that Dr. Mark T. Esper is the current Secretary of the Army. *See* "Secretary of the Army," U.S. Army, https://www.army.mil/leaders/sa/bio/. The Court asks the Clerk to please make this substitution on CM/ECF.

all of Ms. Atkins's claims against it.  (Doc. 30).

The factual basis for Ms. Atkins's claims concerns the process for advancement for civilian employees of the Army.  The regulations and evidence relating to that process lie at the heart of this dispute, and the evidence consists of many Army acronyms.  The Court begins the factual background section of this opinion with a key for some of the acronyms that appear repeatedly in the opinion. The Court then describes the promotion process for civilian employees of the Army.  Finally, the Court identifies the specific facts pertinent to Ms. Atkins's discrimination claims against the Army.

Based on its review of the evidence in the record, for the reasons explained below, the Court will enter judgment for the Army on Ms. Atkins's gender discrimination claim and will deny the balance of the Army's summary judgment motion.

## I.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). The Court does not make credibility determinations; that is the work of a jury. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Still, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Army submitted 88 paragraphs of "undisputed facts" in its motion for summary judgment, many of which are disputed and some of which are conclusory. (Doc. 30, pp. 8-24). The Army filed deposition transcripts,

declarations, and other evidence in support of its version of the facts concerning Ms. Atkins's employment. (Docs. 28-1 through 28-44).[2] Ms. Atkins submitted a declaration to "serve as her response to [the Army's] [s]tatement of undisputed facts." (Doc. 38-1, p. 1). The Court accepts as true the non-conclusory facts that Ms. Atkins identified in her declaration. *See Stein*, 881 F.3d at 857. *See* pp. 22-23 below. The Court views all of the evidence in the record in the light most favorable to Ms. Atkins, the non-movant.

## II.   FACTUAL BACKGROUND

### A. <u>Army Acronyms</u>

The following acronyms have the following meanings:

CISSP – Certified Information Systems Security Professional

IA – Information Assurance

IAMD – Integrated Air & Missile Defense

IAMD PO – Integrated Air & Missile Defense Project Office

IAM – Information Assurance Manager

IASO – Information Assurance Security Officer

Lead IAM – Lead Information Assurance Manager

PEO M&S – Program Executive Office, Missiles and Space

---

[2] The evidence that the Army filed includes Ms. Atkins's written discovery responses. (Doc. 28-1, pp. 262-75). Ms. Atkins did not sign her interrogatory responses as Rule 33(b)(5) requires (Doc. 28-1, p. 267), but the Army has not challenged Ms. Atkins's answers on that basis.

**B. <u>Advancement Process for Civilian Employees of the Army</u>**

Civilian employees of the United States Army may advance through 15 performance levels. "The General Schedule [GS] has 15 grades—GS-1 (lowest) to GS-15 (highest). Agencies establish (classify) the grade of each job based on the level of difficulty, responsibility, and qualifications required." *Pay & Leave: General Schedule Overview*, Office of Personnel Management, http://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/generalschedu le/. Certain civilian positions are designated as career development series positions. A civilian employee in a development series position does not have to compete for a promotion to the next grade in the series. (Doc. 28-1, p. 41). Instead, an agency promotes the employee to the next grade in the series upon satisfactory performance of the duties of each grade. (Doc. 28-1, p. 41; Doc. 38-1, p. 2). A civilian employee may receive a non-competitive grade promotion every 52 weeks. (Doc. 28-1, p. 41).

When a civilian employee in a development series position reaches the highest grade in the performance series, to advance to the next grade, the employee must either compete for an open position at a higher grade level or request a desk audit and demonstrate that she is performing the duties that the agency classified for the next grade in the schedule. *See* 5 C.F.R. § 335.103(c)(3)(ii) ("Discretionary Actions. Agencies may at their discretion except the following actions from the

competitive procedures of this section: . . . (ii) A promotion resulting from an employee's position being classified at a higher grade because of additional duties and responsibilities[.]") (emphasis omitted); *Stewart v. Fed. Commc'ns Comm'n*, 177 F. Supp. 3d 158, 175-76 (D.D.C. 2016).

### C.    Ms. Atkins's Initial Assignments and Opportunities to Advance

In 2003, while she attended college, Ms. Atkins began working as a civilian employee of the United States Army at the Redstone Arsenal in Huntsville, Alabama. (Doc. 28-1, pp. 31-32). She served as a GS-1 clerk in a lower tier project office. (Doc. 28-1, p. 31; Doc. 38-1, p. 1). In 2007, she transferred to the IAMD Project Office of the Program Executive Office, Missiles & Space (IAMD PEO M&S) as a GS-7 Student Trainee Program Analyst. (Doc. 28-1, p. 226; Doc. 38-1, p. 2). Shortly afterwards, IAMD promoted Ms. Atkins to GS-9 based on her exceptional performance. (Doc. 38-1, p. 2).

In March 2008, Ms. Atkins converted to a Career Conditional Appointment as a Program Analyst in a GS-9/11/12 development series position. (Doc. 28-1, p. 221; Doc. 38-1, p. 2). In Ms. Atkins's position, she could be non-competitively promoted from GS-9 to GS-11 after successfully performing her GS-9 duties. (Doc. 28-1, p. 41). She then could be non-competitively promoted to GS-12 after successfully performing her GS-11 duties. (Doc. 28-1, p. 41). GS-12 was the full performance level of Ms. Atkins's developmental series position. (Doc. 28-1, p.

221).  She attained GS-12 in January 2010.  (Doc. 28-1, p. 208; Doc. 38-1, p. 2).[3]

### D.  The 2009 Lead Information Assurance Manager Appointment

In 2009, the IAMD PO worked to achieve "Milestone B," a component of the IAMD Battle Command System project.  (Doc. 30, p. 10, ¶ 13; Doc. 38-1, p. 3).  Ms. Atkins was part of the effort.  (Doc. 38-1, p. 3).  Officials in Washington, D.C. sent Ms. Atkins a letter of appreciation for her performance on Milestone B.  (Doc. 38-1, p. 3).

Mike Achord, the Deputy Project Manager at IAMD, needed a Lead Information Assurance Manager (Lead IAM) for Milestone B to coordinate the efforts of the government and Northrup Grummon, the contractor selected for the project.  (Doc. 28-3, p. 19, tp. 72; Doc. 28-5, p. 3, ¶ 11).[4]  A Lead IAM has final authority on Information Assurance decisions and significant responsibilities and status.  (Doc. 38-1, p. 4).  Mr. Achord testified that the Lead IAM is the "focal point" for IA matters.  (Doc. 28-3, p. 20, tp. 76).  Patricia Long, who served for a

---

[3] While she worked her way through her developmental series, Ms. Atkins received a number of cash awards in recognition of her contribution to the Army.  (Doc. 28-1, pp. 105-06).  Mike Achord, the Deputy Project Manager at IAMD, prepared a written narrative in support of Ms. Atkins's receipt of a $3,500 Individual Cash Award for exceptional performance in October 2008.  (Doc. 38-1, p. 3).  Mr. Achord stated that he never recommends an award that an employee has not earned.  (Doc. 38-1, p. 3).  In December 2008, Ms. Atkins received $1,800 as an additional Individual Cash Award for exceptional performance.  (Doc. 38-1, p. 3).  In March 2009, Ms. Atkins received a $2,000 Individual Cash Award for exceptional performance.  (Doc. 38-1, p. 3).  In January 2010, when she completed her development series position and attained GS-12, Ms. Atkins received a $1,000 Individual Cash Award.  (Doc. 38-1, pp. 2-3).

[4] At some time, IAMD referred to the "Lead IAM" as an "Information Assurance Security Officer (IASO)."  (*See* Doc. 28-1, pp. 49-51; Doc. 30, p. 4; Doc. 39, p. 4).  The Court and the parties use the terms "Lead IAM" and "IASO" interchangeably.

period of time as the Lead IAM in the IAMD PO, testified that the Lead IAM "oversees the efforts of the government and contractor team to ensure that the product is secure to the best cyber security perspective." (Doc. 28-4, p. 124). Jeffrey Stevens, Ms. Atkins's first-level supervisor, stated that the "[d]esignation as the Lead IAM is a title only. It does not confer any promotion or increase in pay or benefits. It simply designates the person who will have final authority on (i.e., has ultimate responsibility for) Information Assurance (IA) issues." (Doc. 28-6, pp. 1-2, ¶ 6). IAMD was responsible for a number of systems in addition to the Battle Command System, and the Lead IAM for each system was GS-13 or higher. (Doc. 38-1, p. 4).

Initially, Kris Clark served as the Lead IAM for Milestone B. (Doc. 38-1, p. 5). In June 2009, after Mr. Clark left the Lead IAM position, Charley Robinson, the IAMD Systems Engineering Director, and Tammy Still, the Software Division Chief for IAMD, recommended Ms. Atkins to Mr. Achord for the position. (Doc. 28-3, p. 11, tp. 37; Doc. 28-3, p. 15, tp. 54; Doc. 38-1, pp. 3-4). In response to the recommendation, Mr. Achord asked "how long he [could] wait" to fill the vacancy. (Doc. 28-3, p. 20, tpp. 74-75; Doc. 38-1, p. 4). At the time, Mr. Achord was considering Ms. Long for the position. (Doc. 28-3, p. 13, tp. 46).

In November 2009, IAMD appointed Ms. Long, who is white, as Lead IAM. (Doc. 38-1, p. 4). Ms. Long had not worked on the Milestone B project; she was

new to the project when she took the Lead IAM position. (Doc. 38-1, p. 4).[5]

### E. **Ms. Atkins's CISSP and Title Reassignment**

In June 2010, Ms. Atkins received her Certified Information Systems Security Professional (CISSP) certification. (Doc. 38-1, p. 5). In support of Ms. Atkins's CISSP application, Ms. Long wrote an endorsement letter in which Ms. Long stated that Ms. Atkins had performed Lead IAM duties for 33 months, had good character and reputation, and could render professional service without supervision. (Doc. 38-1, p. 5). In recognition of her CISSP and other contributions, Ms. Atkins received a $2,000 Individual Cash Award. (Doc. 38-1, p. 5).

In July 2010, Ms. Atkins's title changed from "Program Analyst" to "Information Assurance Manager" because she received her CISSP certification and performed IA duties while supporting Ms. Long as the Lead IAM. (Doc. 28-1, pp. 59, 207; *see* Doc. 28-24; Doc. 28-43, p. 18). Ms. Atkins remained a GS-12 after the title change. (Doc. 28-1, pp. 58, 207). Ms. Atkins and one other African-American female were the only employees in PEO M&S who were not GS-13 or higher. (Doc. 38-1, p. 5).

---

[5] According to the Army, Ms. Long was uniquely qualified for the position. (Doc. 30, p. 11, ¶ 18). At the time of her appointment, Ms. Long worked as a GS-13 Lead Engineer. (Doc. 28-4, pp. 105-06). Ms. Long had worked for the Army for 20 years, possessed her CISSP certification, served as Lead IAM for three different programs, and served numerous other leadership positions. (*See* Doc. 28-4, pp. 19-20, 104-05, 110-15, 119-20, 170-71).

## F.     The December 8, 2010 Email

In early December 2010, Ms. Long met with Mr. Stevens to discuss a plan to develop Ms. Atkins towards GS-13 and the Lead IAM appointment.  (Doc. 28-6, p. 2, ¶ 12; Doc. 38-1, pp. 5-6).  On December 8, 2010, Ms. Long sent Mr. Stevens an email about Ms. Atkins's development plan.  (Doc. 28-31).  In the email, Ms. Long stated in part:

> [Ms. Atkins] needs, wants and deserves more responsibility.  I don't know if that is the plan with the promotion or not but she needs to be able to spread her wings a bit.  I think the promotion to GS13 will provide a platform for her to do that and in my opinion will go a long way toward encouraging her to stay here at IAMD.  Now that she will soon be a GS13, my suggestion is that we consider working toward a plan to make her the IASO/IA lead by this time next year.  Note that quite a few project offices have GS13's as the IASO.

(Doc. 28-31, pp. 1-2).  In the lengthy email, Ms. Long expressed her full support for Ms. Atkins advancing and becoming Lead IAM.  (Doc. 28-1, pp. 1-2).  Mr. Stevens responded, "I think your overall plan sounds great.  Also discussed with Mike [Achord] and he's on board."  (Doc. 28-31, p. 1).  Ms. Long forwarded the email to Ms. Atkins and let Ms. Atkins know that a meeting with Mr. Stevens would be arranged.  (Doc. 28-31, p. 1).

Ms. Long planned to transfer IA duties to Ms. Atkins so that Ms. Atkins could become Lead IAM by December 2011.  (Doc. 38-1, pp. 5-6).  The development plan was a "phased-in approach whereby [Ms. Atkins] would assume increasing responsibilities."  (Doc. 38-1, p. 6) (internal quotation marks omitted).

Notwithstanding the December 2010 email, the Army contends that beginning in 2010, Ms. Atkins became hostile to Ms. Long, but Ms. Long kept the problem to herself. (Doc. 30, pp. 14-15). The Army asserts that by the end of 2010, others at IAMD had begun to notice "problems" with Ms. Atkins's "interpersonal skills and decision-making." (Doc. 30, p. 15). Robert Thomas, the project manager for the IAMD PO, ultimately concluded that Ms. Atkins "lacked the professional judgment and practical analysis needed to move projects forward while maintaining IA integrity." (Doc. 28-5, p. 4, ¶ 20). For her part, Ms. Atkins contends that she raised legitimate concerns about the performance of the Milestone B program, concerns that Mr. Achord shared. (Doc. 38-1, p. 6). Mr. Achord acknowledges that there were flaws in the contractor's performance on Milestone B, and "several individuals within the project office" thought, like Ms. Atkins, that documents that the contractor submitted should be rejected, but Mr. Thomas opted to approve the documents with comments so that the project could move forward. (Doc. 28-3, p. 18, tpp. 67-68). Other than the disagreement regarding the contractor's documentation of its work, Mr. Achord was not aware of other concerns about Ms. Atkins's job performance. (Doc. 28-3, pp. 18-19, tpp. 65-69).

### G. Ms. Atkins's Union Grievances

In July 2011, Ms. Atkins filed a First Step Union Grievance. (Doc. 38-1, p.

7). In the grievance, Ms. Atkins alleged that Ms. Long was racially hostile, that Ms. Long pushed Ms. Atkins out of IA duties, that IAMD management attempted to cover up contract breaches, and that IAMD did not promote African-American employees above GS-12. (Doc. 28-12; Doc. 38-1, p. 7). As relief, Ms. Atkins sought designation as Lead IAM and the removal of Ms. Long. (Doc. 28-12). The IAMD Technical Director did not find evidence to support Ms. Atkins's allegations and denied her requests for relief. (Doc. 28-13, pp. 2-3).

In August 2011, Ms. Atkins filed a Second Step Union Grievance in which she brought similar allegations and sought similar remedies. (Doc. 28-14). The IAMD Technical Director found that Ms. Atkins did not support her claims and denied her request for relief. (Doc. 28-16, pp. 7-9).

In October 2011, Ms. Atkins filed a Third Step Union Grievance in which she alleged that Ms. Long discriminated against her on the basis of race, retaliated against her for raising issues with IAMD, and reassigned her duties. (Doc. 28-17, p. 1). As relief, Ms. Atkins sought designation as Lead IAM and a GS-13 promotion. (Doc. 28-17, p. 2). Brigadier General (BG) Ole Knudsen, the Program Executive Officer, investigated Ms. Atkins's Third Step Union Grievance. (*See* Doc. 28-18, p. 4).

## H. Ms. Long's Departure and the Lead IAM Vacancy

On November 30, 2011, in an email to IAMD supervisors Colonel Rasch,

Mr. Stevens, Ms. Christian, and Mr. Achord, Ms. Long discussed candidates for her replacement as Lead IAM. (Doc. 39, p. 8).[6] Ms. Long stated, "the plan is to name Jason Bearden (Mitre) as the IAMD IAM after I depart." (Doc. 39, p. 8). Mitre is a government contractor. (Doc. 28-1, p. 122). According to Ms. Long, Mitre was reluctant to place Mr. Bearden in the Lead IAM position because Mr. Bearden had been working with the IAMD program for a short period of time, and Mitre was concerned that in the climate that existed at IAMD, the company might face legal exposure if one of its employees became Lead IAM. (Doc. 39, p. 8). Ms. Long stated that "[a]s a plan B," IAMD could name Gordon Brown as Lead IAM. (Doc. 39, p. 8). Mr. Brown was an Army employee. (Doc. 39, p. 8). Both Mr. Bearden and Mr. Brown are white. (Doc. 38-1, p. 7). In response, Mr. Achord referred to Ms. Long's plan as "our intended course of action" and stated that IAMD should explore hiring a government employee rather than someone from Mitre. (Doc. 39, p. 9).

On December 2, 2011, Ms. Long left IAMD. (Doc. 28-4, p. 128). At the time, BG Knudsen had not issued his decision on Ms. Atkins's Third Step Union Grievance. (*See* Doc. 28-18, p. 1). Only Col. Rasch, the recently-assigned Project Manager of IAMD, had the authority to appoint a new Lead IAM. (Doc. 28-3, p. 22, tp. 81). Col. Rasch did not appoint a Lead IAM immediately after Ms. Long

---

[6] Mary Susan Christian became Ms. Atkins's supervisor at the IAMD PO in August 2007. (Doc. 28-8, ¶ 4).

left because Ms. Atkins's Third Step Union Grievance was pending. (*See* Doc. 28-19, pp. 1-2; Doc. 28-39; Doc. 30, p. 23, ¶ 77; Doc. 38-1, p. 8). Col. Rasch stated that "the decision was made to await Brigadier General Knudsen's Third Step Decision so as to avoid contradicting any decision he might make or to avoid preempting any corrective action (relief) he might award." (Doc. 28-11, p. 2, ¶ 14).

Col. Rasch communicated with Ms. Atkins while he awaited a decision from BG Knudsen. (Doc. 28-11, pp. 4-7). In an email, Ms. Atkins asked for an opportunity to meet with Col. Rasch to introduce herself and explain some of her concerns from her grievance. (Doc. 28-11, p. 4). Col. Rasch let Ms. Atkins know that he was reluctant to meet with her until the grievance procedure was complete. (Doc. 28-11, p. 4). Col. Rasch spoke with a Management Employee Relations representative who advised him "not to get involved in the ongoing grievance as it worked its way through the system." (Doc. 28-11, p. 1, ¶ 9). Col. Rasch communicated with Mr. Achord and confirmed that Mr. Achord "would be willing to appoint Ms. Atkins as the Lead IAM" regardless of the grievance process outcome. (Doc. 28-11, p. 2, ¶ 16).

On January 27, 2012, BG Knudsen issued his final decision on Ms. Atkins's Third Step Union Grievance. (Doc. 28-18). BG Knudsen found no evidence to support Ms. Atkins's claims and denied Ms. Atkins's requests for relief. (Doc. 28-

18, pp. 2-4).

Shortly after BG Knudsen's decision, Col. Rasch appointed Ms. Atkins to Lead IAM. (Doc. 28-11, p. 2, ¶ 17). On February 9, 2012, Mr. Achord copied Ms. Atkins and Mr. Bearden on an email in which Mr. Achord stated, "[w]e have decided on the following regarding our IAM: IAM – Tiffany Atkins, Alternate IAM – Jason Bearden. I assume we will get appointment letters on both." (Doc. 28-2, p. 42; Doc. 28-39). On February 22, 2012, Ms. Atkins received her formal Lead IAM appointment letter. (Doc. 28-25). According to Ms. Atkins, the Army assigned her the Lead IAM title but gave the Lead IAM duties to Mr. Bearden. (Doc. 28-1, pp. 126, 136, 143, 179-80). Ms. Atkins reported that for a time, she was "restricted to just sitting in [her] office staring at [her] computer screen." (Doc. 28-1, p. 263). Ms. Atkins had the Lead IAM title until she left IAMD in 2013. (Doc. 28-11, p. 2, ¶ 18).

## I. Ms. Atkins's EEOC Complaint and Present Lawsuit

On January 20, 2012, Ms. Atkins filed a formal complaint of discrimination with the EEOC based on the Army's treatment of her. (Doc. 28-19). On March 7, 2013, the EEOC Administrative Judge entered judgment for the Army on Ms. Atkins's complaint. (Doc. 28-20, p. 1). On March 26, 2013, the Assistant Secretary of the Army issued a Final Agency Decision adopting the EEOC's decision. (Doc. 28-21, p. 1). Ms. Atkins appealed the Final Agency Decision to

the EEOC Office of Federal Operations.  (Doc. 28-22).  On May 20, 2015, the OFO affirmed the Final Agency Decision.  (Doc. 28-22, p. 1).

On August 17, 2015, Ms. Atkins filed her complaint in this Court.  (Doc. 1).  Ms. Atkins brings Title VII race discrimination, gender discrimination, and retaliation claims.  (Doc. 1, pp. 4-5).  After discovery, the Army filed a motion for summary judgment.  (Doc. 27).  The Army argues that Ms. Atkins's election of the union grievance process precludes her from bringing some claims in this Court, that some of her claims are untimely, and that there is no genuine dispute as to any material fact on any of Ms. Atkins's claims.  The Court addresses these issues in turn.

## III. ANALYSIS

### A. <u>Preclusion</u>

The Army argues that Ms. Atkins cannot bring most of her claims in this Court because she pursued them through the union grievance process.  (Doc. 30, pp. 27-34).  The Court disagrees.

Pursuant to 5 U.S.C. § 7121(d):

An aggrieved [federal] employee affected by a prohibited personnel practice . . . may raise the matter under a statutory procedure or the negotiated procedure, *but not both*.  An employee shall be deemed to have exercised his option under this subsection . . . at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, . . . *whichever event occurs first*.

(emphasis added).  The Army states correctly that in her union grievances, Ms. Atkins pursued claims of race and gender discrimination based on the failure to promote and the transfer of duties before she received the Lead IAM title.  (*See* Doc. 30, pp. 20-21, 28-30).  But Ms. Atkins bases her Title VII claims on discrete acts that occurred after she filed her third union grievance – acts that "involve[] a new and distinct failure to promote and transfer of not only duties, but actual job assignment, wherein IAMD would now have two IAMs."  (Doc. 39, p. 17).  These discrete incidents that took place after Ms. Atkins filed her third grievance are not "prohibited personnel practice[s]" that Ms. Atkins elected to pursue through the union grievance process.  Consequently, 5 U.S.C. § 7121(d) does not prevent Ms. Atkins from pursuing these new claims.

### B.  Timeliness

The Army argues that Ms. Atkins did not administratively exhaust her failure to promote claims.  (Doc. 30, pp. 34-37).  The Army maintains that Ms. Atkins did not timely bring a claim "based on the December 8, 2010 email" because she filed her EEOC complaint more than one year after the date of the email.  (Doc. 30, p. 34).  The Army also argues that Ms. Atkins did not timely bring a claim based on a failure to promote on or after December 2, 2011, because she did not raise such a claim in her administrative complaint, and instead sought a retroactive promotion based on the December 8, 2010 email.  (Doc. 30, p. 36).  The

Court disagrees.

Ms. Atkins does not bring a claim "based on the December 8, 2010 email." Rather, Ms. Atkins offers the December 8, 2010 email as evidence of the Army's discriminatory and retaliatory treatment of her. Ms. Atkins bases her claims in this lawsuit on the Army's actions after Ms. Long's departure in December 2011.[7]

Ms. Atkins raised race and gender discrimination claims against the Army in her EEOC complaint. Ms. Atkins stated:

> This particular incident was triggered in the last week of November 2011 and the first week of December 2011. It was during that time frame that Patricia Long . . . was going through her last week at IAMD. . . . [Ms.] Long and [Mr.] Stevens conspired to get the contractor in on the position before Ms. Atkins even knew that Ms. Long was leaving[.] Ms. Atkins found out that a white, male contractor ([Mr.] Bearden) was offered the IAMD IAM position.

(Doc. 28-19, pp. 1-2). Ms. Atkins continued:

> He or his company declined to accept the appointment because there was already a government employee (Ms. Atkins) at IAMD who is fully qualified and certified to perform the duties and any attempt to make Mr. Bearden the IAMD IAM would force a government employee to have to take direction from a contractor.
>
> a. Even though Mr. Bearden's company told the [sic] Jeff Stevens and other members of IAMD management that he would not be accepting the IAM appointment, IAMD management has still given him all of the IAM duties and responsibilities, but they have withheld

---

[7] In written discovery responses, Ms. Atkins explained, "Mike Achord withheld approval for the [Lead IAM] promotion and the appointment letter from [] about November 2011 until sometime in February 2012," "[m]y work was given to the white male contractor," and "[f]or a time period ALL of my Information Assurance (IA) duties were transferred to Jason Bearden. I was restricted to just sitting in my office staring at my computer screen." (Doc. 28-1, p. 263) (emphasis in discovery response).

18

the appointment letter because they would rather no one got the letter than to give it to Ms. Atkins[.]

b. Mr. Bearden was given all of Ms. Long's open action items as they related to Information Assurance at IAMD[.]

c. Mr. Bearden has been in several meetings with Jeff Stevens acting as the IAMD IAM[.]

(Doc. 28-19, p. 2).

Ms. Atkins's description of her claims makes clear that she is challenging the Army's actions after Ms. Long left IAMD. Ms. Atkins's request in her EEOC complaint for "a retroactive non-compete promotion (based on accretion) to a GS-13 [with] retroactive date . . . December 9, 2010" does not make her claims untimely. (Doc. 28-19, p. 6). Ms. Atkins's reference to the 2010 email does not mean that her challenge of the Army's actions in naming a new Lead IAM to replace Ms. Long relate back to 2010 for timeliness purposes. Therefore, Ms. Atkins administratively exhausted and timely filed her discrimination claims in this action.

## C.  <u>Race and Gender Discrimination Claims</u>

Ms. Atkins asserts Title VII race and gender discrimination claims because the Army withheld her appointment letter, delayed her appointment to Lead IAM, and gave her Lead IAM duties to Mr. Bearden, a white male. (Doc. 1, pp. 4-5). The Army argues that Ms. Atkins cannot establish a prima facie case of discrimination based on these events or demonstrate that the Army's legitimate,

non-discriminatory reasons for its actions are pretext for discrimination. (Doc. 30, pp. 44-59). The Army's argument with respect to Ms. Atkins's gender discrimination claim is persuasive, but Ms. Atkins has the better part of the argument with respect to her race discrimination claim.

When, as here, there is no direct evidence of discrimination, a plaintiff may identify circumstantial evidence to overcome a motion for summary judgment. A plaintiff may use the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), to prove a race or gender discrimination claim. Under *McDonnell Douglas*, a plaintiff may establish a prima facie case by presenting evidence that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly-situated individual outside of her protected class. *Maynard v. Bd. of Regents of Div. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Abram v. Von Maur, Inc.*, 719 Fed. Appx. 929, 931 (11th Cir. 2018) (citing *Maynard*). In the context of a failure to promote claim, a plaintiff may satisfy the fourth element of her prima facie case by showing that "the employer continued to seek applicants for the position or promoted another employee who was not a member of the protected class" after the employer rejected the plaintiff. *Oliver v. Nat'l Beef*

*Packing Co., LLC*, 294 Fed. Appx. 455, 458 (11th Cir. 2008) (citing *Walker v. Mortham*, 158 F.3d 1177, 1191-92 (11th Cir. 1998)); *see also Hogan v. S. Georgia Med. Ctr.*, No. 17-14867, 2018 WL 4922777, at *4 (11th Cir. Oct. 10, 2018) (citing *Walker*).

"Not all employer actions that negatively impact an employee qualify as 'adverse employment actions.'" *Cheatham v. DeKalb Cty., Ga.*, 682 Fed. Appx. 881, 889 (11th Cir. 2017). "Instead, 'only those employment actions that result in a *serious and material* change in the terms, conditions, or privileges of employment will suffice.'" *Cheatham*, 682 Fed. Appx. at 889 (quoting *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010)) (emphasis in original).

If the plaintiff establishes a prima facie case, then the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the challenged action. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008); *see also Everett v. Grady Mem'l Hosp. Corp.*, 703 Fed. Appx. 938, 948 (11th Cir. 2017) (citing *Rioux*). If the employer satisfies its burden, then the burden shifts back to the plaintiff to prove that the employer's "proffered reason really is a pretext for unlawful discrimination." *Rioux*, 520 F.3d at 1275 (internal quotation marks and citations omitted).

In this third phase of the *McDonnell Douglas* framework, a plaintiff may demonstrate pretext "directly, by persuading the court that a discriminatory reason

more likely than not motivated the employer, or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Paschal v. United Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)).

"[T]he *McDonnell Douglas* framework is not the only way to evaluate an employment discrimination claim at the summary judgment stage." *Hill v. SunTrust Bank*, 720 Fed. Appx. 602, 605 (11th Cir. 2018) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Whenever a plaintiff "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent[,]" that plaintiff "will always survive summary judgment[.]" *Smith*, 644 F.3d at 1328.

### 1. Ms. Atkins's evidence

The Court briefly addresses a few preliminary matters concerning Ms. Atkins's evidence before evaluating Ms. Atkins's discrimination claims.

First, consistent with the standard of review for a motion for summary judgment, Ms. Atkins's description of facts in her declaration can create a question of material fact, but her argumentative, conclusory remarks concerning others' mental operations cannot. *Stein*, 881 F.3d at 856-57. In her declaration, Ms.

Atkins states, for example, that Ms. Long's attempt "to mentor me was a sham and pretext to bring in a white person over me." (Doc. 38-1, p. 5). The Court will disregard that argumentative, conclusory remark and the other conclusory remarks in Ms. Atkins's declaration and accept the factual portions, such as these statements:

- IAMD appointed Ms. Long (a white employee) to Lead IAM. (Doc. 38-1, p. 4).

- Barry Pike told Mr. Achord to put the Lead IAM position on usajobs.gov. (Doc. 38-1, p. 6).

- Ms. Atkins's supervisors sent her to a developmental assignment. (Doc. 38-1, p. 6).

- After she filed her EEOC charge, Ms. Atkins was appointed to the Lead IAM position." (Doc. 38-1, p. 8).[8]

Second, in her response brief, Ms. Atkins provided screenshots of a November 30, 2011 email sent from Ms. Long to Col. Rasch, Mr. Stevens, Ms. Christian, and Mr. Achord, and a response email from Mr. Achord. (Doc. 39, pp. 8-9). The Court has not located the email messages elsewhere in the evidentiary record. It would be better to submit the emails as a separate evidentiary exhibit, but to give Ms. Atkins a full opportunity to present her case, the Court will consider the email messages because the emails can be presented in a form that would be admissible in evidence. *See* FED. R. CIV. P. 56(c)(2)-(3).

_____

[8] Ms. Atkins's attorney may argue that reasonable jurors could draw certain inferences from the facts, but Ms. Atkins may not assert those inferences as fact in her declaration.

2. <u>Ms. Atkins's prima facie case</u>

Ms. Atkins's discrimination theory is in the vein of a failure to promote claim, but Ms. Atkins does not present a traditional fact pattern for a failure to promote claim. Here, IAMD did not ultimately refuse to promote Ms. Atkins to Lead IAM. Rather, Ms. Atkins asserts that she should not have had to wait for the Lead IAM appointment after Ms. Long departed IAMD and that IAMD's decision to reassign the Lead IAM duties to Mr. Bearden, the Alternate Lead IAM, left her with a meaningless title. Without the duties of the Lead IAM, Ms. Atkins could not succeed in a desk audit for a GS-13 promotion, a grade level held by multiple Lead IAMs in IAMD PO of the PEO M&S but by no other African-American in the PEO M&S.

Ms. Atkins has satisfied the first element of her prima facie case. As a female, she is a member of a protected class. *See* 42 U.S.C. 2000e-2(a). As an African-American, she is a member of a protected class. *See* 42 U.S.C. 2000e-2(a). Ms. Atkins also has satisfied the second element of her prima facie case. Because the Army eventually appointed Ms. Atkins as Lead IAM, Ms. Atkins has established that she was qualified for a Lead IAM position. Ms. Long's written communications in support of Ms. Atkins also indicate that Ms. Atkins was qualified for the position. Others in the IAMD project office recommended Ms. Atkins for Lead IAM as early as 2009. (Doc. 28-3, p. 11, tp. 37; Doc. 28-3, p. 15,

tp. 54; Doc. 38-1, pp. 3-4).

With respect to the third element of a prima facie case of discrimination, the Army argues that Ms. Atkins cannot show that she suffered an adverse employment action because the Lead IAM designation did not confer an automatic grade reclassification, a salary increase, or additional benefits. (Doc. 28-1, p. 87; Doc. 28-3, p. 20, tp. 76; Doc. 28-4, p. 123; Doc. 28-6, pp. 1-2, ¶¶ 6, 12). The record demonstrates, though, that the Lead IAM appointment was the means to achieving a grade reclassification and a salary increase, and a Lead IAM had unique privileges and prestige.

With respect to grade reclassification, as discussed above, Ms. Atkins achieved the top classification in her GS-9/11/12 development series position in 2010. By federal regulation, Ms. Atkins could receive a GS-13 classification for the Lead IAM position only by demonstrating in a desk audit that she performed the duties of a GS-13. By appointing Mr. Bearden as Alternate Lead IAM and assigning the Lead IAM duties to him, the Army effectively deprived Ms. Atkins of the means to achieve a GS-13 classification, despite her Lead IAM title. Divested of the duties of the Lead IAM position, the position offered Ms. Atkins no possibility of a favorable desk audit.[9] Within the IAMD PO, the Lead IAM for

---

[9] *See* 5 C.F.R. § 335.103(c)(3)(ii); *Stewart*, 177 F. Supp. 3d at 175-76. Consequently, the Army's adverse treatment of Ms. Atkins in assigning the duties of the Lead IAM to the Alternate IAM had actual economic consequences.

each system, other than Ms. Atkins, was GS-13 or higher.  (Doc. 38-1, p. 4; *see also* Doc. 28-31, p. 2 (Ms. Long email stating that "quite a few project offices have GS13's as the IASO" or Lead IAM)).[10]  Ms. Atkins states that she and another African-American employee were the only civilian employees in the entire PEO M&S who were classified below GS-13.  (Doc. 38-1, p. 4).  The Army has not refuted this evidence.

As for prestige, Lead IAM was a "top" position.  (Doc. 28-31, p. 2).  A Lead IAM had final authority on IA decisions (Doc. 38-1, p. 4), was the "focal point" for IA matters (Doc. 28-3, p. 20, tp. 76), and oversaw "the efforts of the government and contractor team to ensure that the product is secure to the best cyber security perspective."  (Doc. 28-4, p. 123).  The Army never before had appointed an Alternate IAM when the Army selected a Lead IAM.  The summary judgment record indicates that the Army first appointed an Alternate IAM – an Alternate IAM who was a Caucasian male independent contractor – when the Army selected an African-American female as Lead IAM for the IAMD PO.  (Doc. 28-4, p. 84).

Thus, Ms. Atkins has established that she suffered an adverse employment action because the Army, by initially withholding the Lead IAM designation when Ms. Long left the position and then conferring the title on Ms. Atkins but giving all

---

[10] *See* note 4 above.

of the responsibilities of the position to an "Alternate IAM," deprived her of the prestige of the office and of the opportunity to obtain a GS-13 classification.

The Army contends that Ms. Atkins's account of its treatment of her lacks sufficient detail to be an adverse employment action. Ms. Atkins's statement that the Army transferred the Lead IAM responsibilities to Mr. Bearden and that she, at times, had nothing to do but stare at her computer is sufficient to show a reassignment of her duties and a loss of prestige. *Compare Cheatham*, 682 Fed. Appx. at 889 ("Plaintiff's transfer from Station 1 to Station 17 does not qualify because it did not involve 'a reduction in pay, prestige or responsibility' and Plaintiff provides no other reason why 'a reasonable person in [Plaintiff's] position' would view the action as adverse.") (quoting *Hinson v. Clinch Cty. Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) (alteration in original)). As Ms. Atkins discusses in her brief, this unusual arrangement was a serious and material change because the Army's action implied that "Ms. Atkins was not capable of handling the Lead duties on her own, but needed someone to assist." (Doc. 39, pp. 25-26).

Ms. Atkins has established the last element of her prima facie race discrimination claim—that she was treated less favorably than a similarly-situated individual outside of her protected class—because the record shows that neither Mr. Clark nor Ms. Long, both of whom are Caucasian, had an Alternate IAM, and

neither was deprived of the duties of Lead IAM when assigned the title. Based on this evidence, Ms. Atkins has established a prima facie case of race discrimination.

That is not so with respect to Ms. Atkins's claim for gender discrimination. Ms. Long's prior appointment as Lead IAM frustrates Ms. Atkins's ability to establish the last element of a prima facie case of gender discrimination. Although it is true that Mr. Clark, an individual outside of Ms. Atkins's gender class, did not have an Alternate IAM and did not lose the responsibilities of Lead IAM when he received the title, neither did Ms. Long when IAMD selected her as Lead IAM. The Court has considered all of the circumstantial evidence in the record and finds no evidence of discrimination based on gender. Viewing the evidence in her favor, Ms. Atkins's race seems to be the basis of the disparate treatment that Ms. Atkins has identified. Therefore, the Court will grant the Army's motion for summary judgment on Ms. Atkins's gender discrimination claim.[11]

### 3. Army's Non-Discriminatory Reason

The Army maintains that it has offered a legitimate, non-discriminatory reason for the failure to appoint Ms. Atkins to Lead IAM more quickly. The Army states that it delayed Ms. Atkins's appointment because when Ms. Long left IAMD, Ms. Atkins's Third Step Union Grievance asserting race discrimination

---

[11] Because Ms. Atkins has a viable Title VII remedy in this case, the Court need not consider the application of *Jeffries v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980), a binding decision which Ms. Atkins cites in her summary judgment brief. (Doc. 39, p. 27).

was pending.  (*See* Doc. 28-11, p. 2, ¶ 14; Doc. 28-12).  Col. Rasch waited to appoint a Lead IAM until BG Knudsen issued a decision on Ms. Atkins's Third Step Union Grievance to avoid contradicting any decision, corrective action, or relief BG Knudsen might award to Ms. Atkins.  (Doc. 28-11, p. 2, ¶ 14).

But the Army has not explained why it created an Alternate IAM position for Mr. Bearden, a Caucasian independent contractor, when IAMD named Ms. Atkins Lead IAM.  And the Army has not explained why, when it appointed Ms. Atkins as Lead IAM, it assigned the Lead IAM duties to Mr. Bearden, leaving Ms. Atkins without the means to request a desk audit for a GS-13 grade classification like other Lead IAMs in IAMD and leaving Ms. Atkins and one other African-American female as the only employees in PEO M&S without a GS-13 classification.  Thus, the Army has not carried its burden at the second phase of the *McDonnell Douglas* framework.

Accordingly, the Court denies the Army's motion for summary judgment on Ms. Atkins's race discrimination claim.

## D.    <u>Retaliation</u>

"Retaliation against an employee who engages in statutorily protected activity is barred under . . . Title VII . . . ."  *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257-58 (11th Cir. 2012); *see* 42 U.S.C. § 2000e-3(a). Retaliation claims based on circumstantial evidence, like discrimination claims

based on circumstantial evidence, follow a burden-shifting framework that places the initial burden of proof on the plaintiff. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). In the Eleventh Circuit:

> A plaintiff establishes a prima facie case of retaliation by showing that: (1) she "engaged in statutorily protected activity"; (2) she "suffered a materially adverse action"; and (3) "there was a causal connection between the protected activity and the adverse action."

*Gate Gourmet*, 683 F.3d at 1258 (quoting *Howard*, 605 F.3d at 1244); *see also Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (describing requirements to establish a retaliation claim).

The first element, statutorily protected activity, comes in two forms. Activity may be opposition-based or participation-based conduct. "An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) (citing 42 U.S.C. § 2000e-(3)(a)).

Concerning the opposition clause:

> a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). It is critical to

emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation o[r] informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied*, 455 U.S. 1000, 102 S. Ct. 1630, 71 L. Ed. 2d 866 (1982).

*Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir. 1997) (alteration added to correctly quote from *Sias*) (footnote omitted); *see also Jefferson*, 891 F.3d at 924.

Regarding the broad coverage afforded under Title VII's participation clause, the Eleventh Circuit has explained:

Congress chose to protect employees who "participate[ ] in any manner" in an EEOC investigation. 42 U.S.C. § 2000e-3(a) (emphasis added). The words "participate in any manner" express Congress' intent to confer "exceptionally broad protection" upon employees covered by Title VII. *See Pettway v. American Cast Iron*

*Pipe Co.*, 411 F.2d 998, 1006 n.18 (5th Cir. 1969). As we pointed out in *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997), "the adjective 'any' is not ambiguous. . . . [It] has an expansive meaning, that is, one or some indiscriminately of whatever kind. . . . [A]ny means all." (internal quotations and citations omitted).

*Clover*, 176 F.3d at 1353.

With respect to the "materially adverse action" prong of a prima facie case, the United States Supreme Court has explained that a materially adverse action is one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *see also Gate Gourmet*, 683 F.3d. at 1260 (finding material adversity in an employer's decision to deny a light-duty position to the plaintiff after she filed and refused to settle an EEOC charge). A materially adverse action is not limited to action within the workplace. *White*, 548 U.S. at 57 ("[T]he antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace."). Therefore, a materially adverse action does not have to rise to the level of an ultimate employment decision.

As to the third element of a prima facie case, proof of a causal connection between protected activity and the materially adverse action, the Supreme Court has held:

> Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in

§ 2000e-2(m).  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

If a plaintiff establishes a prima facie case of retaliation, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  If the defendant carries its burden of production then, "[t]o survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination [or retaliation]."  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated [or retaliated].").

As stated earlier, a plaintiff can prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Vessels*, 408 F.3d at 771 (internal quotation marks omitted) (quoting *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled*

*on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)); *see also Haugabrook v. Cason*, 518 Fed. Appx. 803, 807 (11th Cir. 2013) (citing *Vessels*).

The record contains disputed issues of material fact concerning retaliation. As to her prima facie case, Ms. Atkins's union grievances opposing race discrimination in the workplace constitute opposition-based conduct. (*See* pp. 11-12, above). The EEO charge that Ms. Atkins filed in January 2012 based on race and gender discrimination, a charge that preceded the Lead IAM appointment in February 2012, constitutes participation-based conduct. (*See* pp. 14-15, above).

Again, the Army argues that Ms. Atkins experienced no materially adverse action. (Doc. 43, p. 16). As discussed above, Ms. Atkins states that the Army delayed her appointment as Lead IAM, took the unprecedented step of appointing an Alternate IAM who was a private contractor rather than a civilian government employee, and assigned most of the Lead IAM job duties to the Alternate IAM. (Doc. 28-1, pp. 126, 136, 143, 179-80). Ms. Atkins testified that for a time, she was "restricted to just sitting in [her] office staring at [her] computer screen." (Doc. 28-1, p. 263). These actions had a financial impact on Ms. Atkins because without Lead IAM duties, Ms. Atkins could not qualify for a GS-13 classification and the raise that would accompany the higher classification. 5 C.F.R. § 335.103(c)(3)(ii); *Stewart*, 177 F. Supp. 3d at 175-76.

Moreover, as stated, actions without economic consequences may be

materially adverse in the context of a retaliation claim if the action would dissuade an employee from challenging discriminatory conduct. Thus, an injury to an employee's prestige by delaying a job title change or creating an unprecedented co-position and filling the position with a contractor from outside of the organization may be materially adverse because either could dissuade a reasonable worker from making or supporting a charge of discrimination. A token title is demeaning, particularly in an organization in which rank and stature are very important and especially when the hollow honor is bestowed upon an African-American employee striving to be the first to achieve a job classification previously held only by Caucasian employees in her work division. Thus, Ms. Atkins has made a prima facie showing of a materially adverse action.

The Army contends that Ms. Atkins cannot show causation. (Doc. 43, pp. 16-17). The Army argues that Ms. Atkins cannot rely on the two-month delay in her appointment to Lead IAM to prove causation because "COL Rasch was completely transparent with [Ms. Atkins] in his policy not to intervene in pending EEO matters and that he worked with MER [Management Employee Relations] to confirm that approach." (Doc. 43, p. 17). A reasonable jury could conclude otherwise, especially when Col. Rasch expressly linked the reason for delay directly to Ms. Atkins's election to challenge in the grievance process IAMD's promotion practices. And the Army does not explain why the creation of an

Alternate IAM position less than one month after Ms. Atkins's filed her EEO charge does not satisfy the causal element. This timeline falls well within the presumptive three-month window for causation. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

For the reasons discussed with respect to Ms. Atkins's discrimination claim, the Army has not established a legitimate non-discriminatory reason for its conduct. Therefore, the Court denies the Army's summary judgment motion with respect to Ms. Atkins's retaliation claim.[12]

## IV. CONCLUSION

For the reasons discussed above, the Court enters judgment in favor of the Army on Ms. Atkins's gender discrimination claim. The Court denies the Army's motion for summary judgment on Ms. Atkins's race discrimination and retaliation claims. By separate order, the Court will set this case for a pretrial conference.

**DONE** and **ORDERED** this January 14, 2019.

*Madeline H. Haikala*
_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[12] Much the evidence that Ms. Atkins cites in support of her prima facie case also would serve as evidence of pretext for her race discrimination and retaliation claims. Thus, even if the Army were able to carry its burden of production at the second stage of the burden-shifting process, there is sufficient circumstantial evidence of pretext in this case to create a fact question concerning discriminatory and retaliatory intent.